**Booker JONES, et al., Plaintiffs,**

v.

**MEMPHIS LIGHT, GAS & WATER DIVISION, Defendants.**

No. 85–2549 H.

United States District Court, W.D. Tennessee, W.D.

Aug. 1, 1986.

---

Lynn Agee, Deborah E. Godwin, Richard Fields, Memphis, Tenn., for plaintiffs.

Sam Weintraub, Jeff Weintraub, Weintraub DeHart Robinson & Coggins, Memphis, Tenn., for defendants.

## ORDER DENYING PLAINTIFFS' REQUESTED RELIEF AND DECLARING AFFIRMATIVE ACTION PLAN PERMISSIBLE UNDER FEDERAL LAW

HORTON, District Judge.

"I can say, without hesitation that there was no doubt in my mind ... that there would be affirmative action beyond the termination of the consent decree. And I characterized that as *life after the consent decree.* And I was concerned about a perception that might be developing among our management staff that, if the consent decree was terminated suddenly, everything would be okay and we would go back to business as usual."

*Larry W. Papasan, President of Memphis Light, Gas and Water Division.*

\*     \*     \*     \*     \*     \*

"IBEW, Local 1288 represents all of its members on an equal basis, be they black, white, male or female. The Union is opposed to discrimination in any form. The Union is not opposed to affirmative action. However, the MLG & W Affirmative Action Plan does not benefit past or identified victims of discrimination, and will in many instances limit the opportunities of blacks and women in areas where the racial or sex balance exceeds the SMSA quota. Seniority is the work-

ing person's best protection of employment rights and promotional opportunities."

*Fredrick B. Ashwill, Business Manager for the International Brotherhood of Electrical Workers, Local Union 1288.*

\*　\*　\*　\*　\*　\*

"Ultimately, the Court is at least in accord in believing that a public employer, consistent with the Constitution, may undertake an affirmative action program which is designed to further a legitimate remedial purpose and which implements that purpose by means that do not impose disproportionate harm on the interests, or unnecessarily trammel the rights, of innocent individuals directly and adversely affected by a plan's racial preference."

*Sandra Day O'Connor, Justice of The Supreme Court of the United States.*

\*　\*　\*　\*　\*　\*

Two male black employees, two male white employees and the International Brotherhood of Electrical Workers Local Union No. 1288 (Union) brought suit against the Memphis Light, Gas and Water Division (MLG & W), a municipal corporation, attacking certain provisions of the voluntary affirmative action plan adopted by MLG & W with the approval of the Board of Commissioners. Plaintiffs contend the "Priority Posting" provisions of the affirmative action plan violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*, and the Fourteenth Amendment to the United States Constitution actionable under 42 U.S.C. § 1983. It is further contended the priority posting plan violates the bona fide seniority provisions of the Memorandum of Understanding between the Union and MLG & W and that the plan is contrary to previous orders entered by the Court in related cases. The defendant argues the plan is valid, constitutional and not violative of the Court's orders.

■ The issue presented is whether the voluntary affirmative action plan, particularly the priority posting provisions, which differ from the seniority system incorporated in the Memorandum of Understanding, is legally permissible under federal law. After careful consideration and a thorough review of the record and evidence, the Court finds the plan is narrowly tailored and substantially related to the objectives of remedying past discrimination and correcting substantial and chronic underrepresentation of black and women employees in the MLG & W workforce. It is also found to be narrow in scope and impact, and to be temporary in nature. The plan satisfies the "strict scrutiny" test and is, therefore, not violative of the Equal Protection Clause of Fourteenth Amendment or of Title VII. The Court further finds the plan does not violate any of the previous Court orders involving the employment practices of MLG & W. Finally, while the Court finds the priority posting provisions of the plan may conflict with the seniority system utilized at MLG & W pursuant to the Memorandum of Understanding with the Union, that fact does not affect the Court's decision that this affirmative action plan is legally permissible under federal constitutional and statutory law.

*Historical Background*

"I can say that, without hesitation, that there was no doubt in my mind ... that there would be affirmative action beyond the termination of the consent decree. And I characterized that as *life after the consent decree.* And I was concerned about a perception that might be developing among our management staff that, if the consent decree was terminated suddenly, everything would be okay and we would go back to business as usual." Trial Transcript (hereinafter Tr.) at 134 (emphasis added).

The "consent decree" to which Mr. Papasan refers was spawned by two lawsuits filed in 1974 regarding the discriminatory employment practices at MLG & W and will be referred to in this order as the *"Armmer"* cases. In 1980 a consent decree was entered which incorporated and modified portions of a previously entered

consent decree in those cases. Both decrees contained the following:

On January 15, 1974, eleven black employees of Memphis Light, Gas and Water Division (Lonzola Armmer, Robert Cummings, Athan Fletcher, Melvin Herron, Junior Holloway, James T. Johnson, Ozell Johnson, O'Neal Jones, James Mayo, Joseph Townsend and George Washington) filed a lawsuit, Civil Action No. C–74–17, against the Memphis Light, Gas and Water Division. On March 12, 1974, the original Complaint was amended, adding fifty additional black employees of Memphis Light, Gas and Water Division as plaintiffs. On May 16, 1974, the United States of America filed a lawsuit against the City of Memphis, alleging that the City of Memphis, including the Memphis Light, Gas and Water Division, had engaged in a pattern and practice of racial discrimination in employment. The issues raised by the Complaint filed by the United States in Civil Action No. C–74–286 with respect to the various agencies and departments of the City of Memphis, other than the Memphis Light, Gas and Water Division, were resolved by a Consent Decree entered by the Court on November 27, 1974.

In October, 1974, upon motion of the United States, Local 1288 of the International Brotherhood of Electrical Workers was added as a defendant in Civil Action No. C–74–286 pursuant to Rule 19, F.R. Civ.P. Subsequent thereto, the Memphis Light, Gas and Water Division filed a cross-action against Local 1288 (I.B.E.W.) in Civil Action No. C–74–286, and filed a Third-Party Complaint against Local 1288 (I.B.E.W.) in Civil Action No. C–74–17.

On December 29, 1975, upon motion by plaintiffs, Lonzola Armmer, et al., private plaintiffs were permitted to amend their Complaint in Civil Action No. C–74–17 to show that on October 20, 1975, sixty of the named plaintiffs had been notified by the Attorney General of the United States that they had a right to file a lawsuit against the defendant, Memphis Light, Gas and Water Division, as a result of previously filed charges with the Equal Employment Opportunity Commission.

On Nov. 10, 1975, an Order was entered consolidating Civil Action No. C–74–17 and C–74–286 for trial. On April 28, 1976, the plaintiffs in Civil Action No. C–74–17 were permitted to intervene in Civil Action No. C–74–286.

Lonzola Armmer, et al. (hereafter referred to as private plaintiffs) brought their lawsuit against Memphis Light, Gas and Water Division to enforce the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and pursuant to 42 U.S.C. §§ 1981 and 1983. The suit further sought to enjoin defendant, Memphis Light, Gas and Water Division, from further violating the Thirteenth and Fourteenth Amendments to the United States Constitution. Civil Action C–74–17 was filed as a class action.

Civil Action C–74–286, filed by the United States of America, also alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981 and the Fourteenth Amendment to the United States Constitution. Civil Action C–74–286 also alleged violations of the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1221, et seq.

Both lawsuits challenged alleged racial discriminatory employment practices by defendants. Civil Action C–74–286 also challenged alleged sex based discriminatory employment practices by the City of Memphis, including the Memphis Light, Gas and Water Division.

The parties hereby stipulate that there has existed in the Shelby County area a history of race and sex discrimination which this decree is designed to remedy in part. The Memphis Light, Gas and Water Division will hereafter be referred to as "MLGW" and Local 1288, International Brotherhood of Electrical Workers, will hereafter be referred to as "IBEW." MLGW and IBEW deny that they are engaged at MLGW in any deliberate pattern or practice of overt race or sex discrimination in hiring or promotion, but MLGW

realizes that certain practices may have given rise to the inference that such practices of discrimination in hiring or promotion may have occurred. MLGW states that for the purpose of avoiding any further inferences of discrimination, it has taken certain steps at MLGW to increase the employment opportunities of qualified blacks and females by transfers and promotions and has instituted an affirmative action program at MLGW. IBEW, while denying it has engaged or cooperated in any pattern or practice which could be discriminatory, agrees to the extent that the Memorandum of Understanding with MLGW is contrary to this Consent Decree, this Consent Decree shall govern.

For the same purpose and with the same intent, the parties are now willing to agree to the entry of a Consent Decree providing for additional measures to be taken. All parties desire to insure that any disadvantage to blacks and females that may have resulted from any past discrimination in obtaining employment and advancement is remedied so that equal employment opportunity will be provided to all. The parties, by agreeing to the issuance of this Order, waive a hearing and findings of fact and conclusions of law on issues raised by the Complaints except as specified herein with respect to Memphis Light, Gas and Water Division.

The consent decrees also contain the following agreements:

1. The defendants, their officials, agents and employees, and all persons acting in concert with them in the performance of Memphis Light, Gas and Water Division functions shall not engage in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or potential applicant for employment with Memphis Light, Gas and Water Division, because of such individual's race or sex, it being understood that remedial actions and practices permitted or required by this Decree shall not be deemed discriminatory. Specifically, Memphis Light, Gas and Water Division and, where applicable, International Brotherhood of Electrical Workers, shall not fail or refuse to hire, promote, upgrade, train or assign any individual or otherwise discriminate against an individual as an employee or applicant for employment with respect to compensation, terms and conditions or privileges of employment because of such individual's race or sex. No person shall be adversely affected or retaliated against in any manner by defendants because that person has opposed discriminatory policies or practices or because that person has made a charge of discrimination with any governmental agency, or testified, assisted, or participated in any manner in an investigation or prosecution of such alleged discriminatory policies or practices.

2. The purpose of this Decree is to insure that blacks and women are not placed at a disadvantage by the hiring, promotion and transfer policies of Memphis Light, Gas and Water Division, and that any disadvantage to blacks and women which may have resulted from past discrimination is remedied so that equal employment opportunities will be provided to all. The defendants have agreed that in determining whether that purpose has been achieved, an appropriate standard of comparison is the proportion of blacks and women in the Shelby County labor force. The defendants agree to undertake as the long-term goal in this Decree, subject to the availability of qualified applicants, the goal of achieving throughout the Memphis Light, Gas and Water Division work force, proportions of black and female employees in each job classification approximating their respective proportions in the Shelby County civilian labor force, except that for those job classifications with fewer than five employees, achievement of the long-term goal will be evaluated by grouping those job classifications by salary grades and achieving those proportions of black and female employees for that group of positions within each salary grade.

. . . . .

6. For all purposes of promotion, transfer, layoff and assignment, the seniority

utilized by a person in the affected class as defined in paragraph 5 shall be that person's "Division" seniority.

7. (a) In meeting the long term and interim goals established pursuant to this Decree, MLGW shall utilize the following procedures for filling non-supervisory positions:

(1) In filling vacancies in the bargaining unit which, under the provision of the Memorandum of Understanding, are open to bid, MLGW shall follow the procedures in the Memorandum, subject to paragraph 6 above, except that bids shall be accepted from any Division employee, and that where a member of the affected class is the senior qualified bidder who meets the minimum qualifications for the position, that person shall be selected for the vacancy.

(2) In filling vacancies in lines of progression established in the Memorandum of Understanding, MLGW shall follow the provisions of the Memorandum of Understanding, subject to paragraph 6 above, except that when the operation of the provisions would prevent compliance with the interim goals established in this decree, MLGW shall by restricted posting, make such vacancy available to all members of the affected class, and select the senior qualified member of the affected class who has applied to promote or transfer to the position. In the event no qualified member of the affected class indicates an interest in the vacancy, selection shall be made according to the line of progression provisions of the Memorandum.

. . . . .

19. The Court retains jurisdiction of this action for such further order as may be appropriate until December 31, 1983. At that time, this Decree shall be dissolved, unless prior thereto either attorneys for the private plaintiffs or attorneys for the United States file an objection to termination in whole or in part of the Decree. If such objection is filed, the Decree, or the relevant portion thereof, shall continue in effect unless and until MLGW can demonstrate that it has substantially complied with the provisions of the Decree and that the basic objectives thereof have been achieved.

Prior to December 31, 1983, the consent decree was voluntarily extended for two months to allow review of certain records and statistics related to MLG & W's employment practices since 1980. The Armmer plaintiffs, upon completion of that review agreed MLG & W had substantially complied with the consent decree; they filed no objections to the termination nor did the United States. However, members of the affected class were allowed the opportunity to object and several did so. A number of those objections were individual complaints of discrimination but most centered on problems with job testing, education requirements and training programs. Because of the objections, MLG & W was required to show substantial compliance with the provisions of the consent decree. MLG & W filed a report, supported by supplemental data and statistical information, summarizing the progress it claimed had been made in meeting the goals set forth in the 1980 consent decree.

On February 27, 1984, following a hearing on the issues, the Court entered an order terminating the consent decree. The Court basically agreed with the report filed by the private plaintiffs and MLG & W, and, after reviewing the entire record, found MLG & W had demonstrated substantial compliance with the 1980 consent decree and its objectives. Those objectives and the efforts to meet them were summarized as follows:

The long term goal of the Consent Decree is to hire and promote blacks and females so that the number of black and female employees in each job classification at MLGW corresponds with their respective proportions in the labor force in Shelby County. For 1980 blacks represented approximately 35.2 percent of the Shelby County labor force and women represented approximately 33.2 percent of the work force. A number of interim goals were also set by the Consent Decree. These

were goals which MLGW agreed to "take all reasonable steps to achieve" in meeting the long term goal. The interim goals were:

1. Fifty percent of all vacancies in job classifications where the long term goal has not been met were to be filled by qualified blacks;

2. One-third of all vacancies in job classifications evaluated on the clerical schedule where the long term goal has not been met were to be filled by qualified women;

3. One-third of all vacancies in job classifications in nonsupervisory management and exempt employees pay plan where the long term goal has not been met were to be filled by qualified women;

4. Twenty percent of all vacancies in job classifications classified as entry level line of progression (LOP) positions on the trades and crafts schedule were to be filled by qualified women;

5. One third of vacancies in positions requiring engineering degrees were to be filled by qualified black and/or female applicants; and

6. Fifty percent of vacancies in supervisory positions were to be filled by blacks and females.

MLGW's record from January 1, 1981 to November 1, 1983, in achieving these goals is as follows:

1. MLGW has filled 1,525 jobs. Blacks have filled 663 or 43.5 percent of these jobs.

2. In job classifications subject to goals for females, women filled 39 percent of jobs evaluated on the clerical schedule, 36 percent on the nonsupervisory and exempt schedule, and 14 percent of the entry level LOP jobs on the trades and crafts schedule.

3. Blacks and females have filled 27.6 percent of jobs requiring an engineering degree.

4. In supervisory jobs 141 vacancies were filled. Blacks and women received 51 positions or 35 percent. Of the 51 blacks and females, 31 were affected class members.

The Court then commented on the "most significant failures in meeting the interim goals" and noted the "new procedures" implemented by MLG & W for hiring and promotions. The most relevant for present purposes was the development of the "Lopez Test" which was utilized for assessment of applicants for nonsupervisory positions. The Lopez Test was found to be validated as job related but it was also found to have had an adverse impact on incumbent black employees generally due the MLG & W's past practice of hiring blacks in labor jobs "who lacked basic formal education." However, it was noted the test did not have an adverse impact on black applicants in general. Evidence submitted indicated to the Court that MLG & W provided extensive training and educational opportunities for its employees in response to the fact many incumbent employees lacked the basic educational skills needed for upward mobility. Unfortunately, that evidence also indicated many of the employees did not avail themselves of the opportunities provided.

While the Court found substantial compliance with the consent decree had been made, it was deemed appropriate that comment should be made on the progress achieved by MLG & W. The Court stated:

First, the concerns raised by the individual objectors are legitimate ones. Almost all of them have some basis in fact on this record. Nevertheless, the court is ordering termination of the Consent Decree because the decree calls for substantial compliance, not perfect compliance. Hopefully, MLGW will continue to work with its employees toward more complete achievement of the interim and long term goals of the Consent Decree. In addition, MLGW ought to review on a regular basis its testing and education requirements and make adjustments when appropriate. Perhaps it can also devise ways of encouraging employees to acquire basic educational skills.

Many of the individual objections as well as communications received by the court from MLGW employees over the past few months indicate that these employees feel that they will have little protection from discrimination in the absence of the consent decree. While the court is mindful of these employees' concern, employment discrimination litigation such as this ought not be a mechanism for indefinite judicial supervision of an employer's hiring and promotion practices. Employees still have the statutory protection afforded them by Title VII and other applicable law and can seek judicial relief again in the future if necessary. The existence of adequate remedies of this type discourages employers from further discrimination, just as ongoing litigation does.

Despite termination of the decree, affected class members will in all probability benefit from the relief ordered by the court in connection with MLGW's violation of the decree through its targeting program. As the representative of the affected class pointed out at the hearing in connection with termination of the decree, targeting has had an adverse impact on members of the affected class in some situations. The concerns of affected class members arising from past targeting should be alleviated through the relief ordered as a result of the union's motions.

A final point with regard to termination of the decree deserves discussion. Private plaintiffs in the report filed with the court seemed to condition their lack of objection to termination of MLGW's voluntary adoption of an affirmative action program. This matter was discussed in some detail at the hearing on termination. At that time counsel for private plaintiffs clearly indicated that his lack of objection to termination was not conditioned on the adoption of such a program. Although counsel for private plaintiffs was clearly influenced in his evaluation of MLGW's good faith in complying with the decree by its willingness to continue affirmative action efforts, it was also clear that he recognized the court's findings with regard to substantial compliance would not depend on promises

of future adoption of a voluntary affirmative action program. The court's position was and is that its decision as to termination of the decree should be governed solely by the evidence before it as to MLGW's progress in achieving substantial compliance with the decree.

For the foregoing reasons, the Consent Decree in this case will terminate on February 29, 1984. The court retains jurisdiction of this cause for the purpose of determining the ultimate relief to be awarded in connection with the union's motions on which the court has ruled today.

The motions to which the Court referred were filed by the Union and sought various forms of relief arguing MLG & W had violated the consent decree by use of a "targeting" program. Following a report and recommendation from the Magistrate with which the Court generally agreed, an order was entered on February 27, 1984, granting the Union's request for a declaratory judgment and retaining jurisdiction to determine appropriate relief to be afforded the individuals affected by the targeting program.

After initially determining the Union had standing to complain about violations of the 1980 consent decree, the Court addressed the issue of "targeting" and its relationship to the consent decree. The Court noted "targeting" was not specifically authorized by the consent decree and then stated:

The word targeting is mentioned in the goals of the 1980 decree; yet the evidence does not support a finding that the parties mutually understood that word to encompass a program of the type ultimately carried out or that they agreed that MLGW would undertake additional affirmative steps against discrimination which conflicted with other specific provisions in the decree such as paragraph seven. Further, the court agrees with the magistrate that the decree is properly interpreted as limiting MLGW to the specific provisions of the decree in making promotions and filling

jobs covered by the Memorandum of Understanding.

Third, the court agrees with the magistrate that the union has been consistent in asserting the interpretation of the decree it now urges upon this court and has also raised its position with the court in a timely manner.

A fourth point with regard to this controversy merits some discussion prior to consideration of an appropriate remedy. Private plaintiffs and MLGW have contended that the magistrate erred in describing the Memorandum of Understanding as "in effect, a collective bargaining agreement" which possessed the properties of a contract and should be interpreted as such. They point out that the Tennessee courts have consistently ruled that so-called contracts between municipalities and unions representing their employees are unenforceable, even when the municipal corporation is acting in a proprietary manner. *Fulenwider v. Firefighters Association,* 649 S.W.2d 268, 270 (Tenn.1982); *Keeble v. City of Alcoa,* 204 Tenn. 286, 319 S.W.2d 249 (1958); *Weakley County Municipal Electric System v. Vick,* 43 Tenn.App. 524, 309 S.W.2d 792 (1957). The union responds that none of the Tennessee cases cited by private plaintiffs and MLGW is dispositive of the issue of enforceability of the Memorandum under state law in the instant circumstances. It also argues that, irrespective of the Memorandum's enforceability under state law, the Memorandum has here gained a different status by virtue of incorporation of its provisions in the 1976 and 1980 consent decrees.

The cases cited by private plaintiffs and MLGW do indicate that the Memorandum of Understanding may not in fact be an enforceable contract under Tennessee law. However, a decision as to enforceability of the Memorandum under state law is unnecessary here. Regardless of what legal status the Memorandum may have had or what status MLGW and the union may have accorded it prior to entry of the consent decrees,[5] with the entry of the decrees the Memorandum attained the status set forth in the decree. Paragraph seven of the 1980 consent decree is clear in its language; in it MLGW affirmatively agreed to follow the procedures set forth in the Memorandum in filling nonsupervisory jobs except under the specific circumstances described in paragraph seven. That affirmative agreement by MLGW became a court order. The heart of the union's complaint and the conduct for which relief is ordered here is the violation of the court order, not the violation of provisions of the Memorandum. Thus, the court's ruling in this dispute does not grant the Memorandum status to which it would not be entitled under state law; the ruling merely recognizes the status it was accorded by agreement of MLGW and prior order of this court.

(Footnote omitted).

*Life After the Consent Decree—The Plan*

Shortly before the termination of the 1980 consent decree, MLG & W made the determination that what Mr. Papasan called "life after the consent decree" would include an affirmative action plan designed to move MLG & W toward the goal of compliance with the Standard Metropolitan Statistical Area (SMSA) guidelines. Mr. Papasan testified:

> Well, it was obvious that our goal of the SMSA had not been completed, and we had made a commitment, I felt, to strive toward meeting those goals. And there were some areas that I felt that we [had not] made ... sufficient progress in, so my interpretation of the data was that we still had work to be done and we needed the affirmative action plan in order to assist us to get it done within a reasonable time frame.

Tr. 353. It is also apparent that MLG & W wanted "out from under" the decree because of the various limitations and administrative burdens imposed. Further, while the termination of the consent decree was clearly not contingent upon MLG & W initiating an affirmative action plan, all parties concerned were obviously aware of the intention to do so.

On March 15, 1984, MLG & W presented an affirmative action plan, developed and drafted by its officers and legal counsel, to the Board of Commissioners. The Board, by resolution, adopted the plan and approved it for immediate implementation. The plan included the following provisions:

The purpose of the affirmative action policy is to promote or employ qualified individuals to achieve racial and sex balance in accord with the SMSA as defined herein. Qualified candidates will be promoted or employed to meet the goal as established herein.

.      .      .      .      .

The division recognizes there are some areas, job classifications, departments, and salary grades in which there is underutilization of females and blacks.

The goal of the division is to achieve in each responsibility section white, black, and female employees in each salary grade approximating their respective proportions in the Shelby County civilian labor force as defined by the Standard Metropolitan Statistical Area (the "SMSA").

The SMSA for the purpose of these goals is as follows: white male 37%, black male 18%, white female 27% and black female 18%.

Priority postings will be used only in those salary grades within responsibility sections where white, black, and female employment ratios differ from the SMSA.

.      .      .      .      .

The Affirmative Action Plan adopted herein shall be for a duration of five years and shall expire March 1, 1989, or earlier if the division has reached 90% of the SMSA goals in all salary grades.

From its inception, the plan ran into difficulties and MLG & W soon realized "the plan was almost impossible to work with as it was written." Tr. 364. The Union raised several objections to the plan, particularly the priority posting provision; in August of 1984, a grievance was filed alleging priority posting violated the seniority pro-

cedures set forth in the Memorandum of Understanding. MLG & W refused to hear the grievance on the basis the matter was a Board decision and, thus, not reviewable via the grievance procedures.

The Union also continued to point out errors and procedural problems involved with the implementation of the plan. As noted above, it became apparent that modification of the plan or adoption of a new affirmative action was necessary. Prior to the adoption of the "new" plan various meetings were held involving the Union and MLG & W officials in an attempt to resolve the problems and develop a plan that all concerned "could live with." Subsequent to those meetings but prior to the adoption of the current plan, Fred Ashwill, Business Manager for the Union sent Mr. Papasan a letter detailing the Union's objections and making various proposals. After noting problems in several specific job categories, the letter went on to state the Union's conclusions regarding the March, 1984 plan and offer several proposals. The letter's "Conclusions" began as follows:

The agreed purpose of this Affirmative Action Plan is to continue the progress made under the consent decree, to remedy past discrimination, and to provide equal opportunity for all employees. It should be recalled that the Court identified individuals, who came to be referred to as the "affected class," as victims of discrimination. Many of the members of its [sic] class still suffer from the effects of discrimination.

After reviewing the Affirmative Action Plan, the data contained in the Affirmative Action Compliance Report, MLG & W testing requirements, and actual experience, it is my conclusion that the Affirmative Action Plan will not serve its purpose. It is not directed at the individuals who are victims of past discrimination, and because of its broad approach, will adversely affect many innocent employees.

Mr. Ashwill also stated the difficulties encountered in the initial implementation of the plan indicated its "ineffectiveness and

impracticability." The letter also contained the following proposals:

1. Since management jobs are dominated by white males, the priority posting system should be retained for these management positions. Priority posting in these areas will not conflict with the bona fide seniority provisions of the Memorandum of Understanding.

2. Priority posting should be retained in hiring situations where the position cannot be filled from within the division.

3. Priority posting should be eliminated for bid jobs covered by the Memorandum of Understanding except in cases involving identified victims of discrimination. Those individuals actually identified as victims should be entitled to priority treatment, since had it not been for the discrimination, they would have received the job in question.

Mr. Ashwill concluded the letter by stating:

The Union is opposed to discrimination in any form. The Union is not opposed to affirmative action. However, the MLG & W Affirmative Action Plan does not benefit past or identified victims of discrimination, and will in many instances limit the opportunities of blacks and women in areas where the racial or sex balance exceeds the SMSA quota. Seniority is the working person's best protection of employment rights and promotional opportunities.

There is no easy solution to these complex issues and it is hoped that our proposals will provide a basis for an affirmative action program that is tailored to the needs of the workers. We remain willing to discuss our proposals with you, the MLG & W Board members, and all other interested parties. We must, however, continue to request that the priority posting system be held in abeyance pending the outcome of our discussions so that innocent parties are not adversely affected. I would like to present these observations and proposals to the Board formally as its meeting on October 31, 1984.

According to the testimony of Michael Magness, Personnel Manager at MLG & W, he and other officials met with the Union on October 31, 1984, to discuss modification of the March plan. MLG & W had developed a rough draft of a new plan which incorporated some of the suggestions made by Mr. Ashwill in the October letter. During November and early December MLG & W continued to work on the development of a new plan and had several meetings with the Union. On December 4, 1984, a copy of the proposed plan was delivered to the Union's legal counsel sometime prior to the Union's Executive Board meeting. Then on December 6th, MLG & W and the Union met for a "final review" of the new plan.

The new affirmative action plan was presented to the Board of Commissioners on December 12, 1984, and by resolution, the new plan, superseding the March plan, was unanimously adopted. Although the reason is disputed, the Union made no objection at the Board meeting.

James L. Netters, a member of the Memphis Light, Gas and Water Division Board of Commissioners testified:

After having read the plan and having been briefed on it by the personnel, the director, the president, I asked the question during the meeting had they had the input from the union, and the union representatives were present in the meeting, and they assured me that they had had input from the union. I asked was the union pleased with the present draft of it. They said that perhaps, if I can—I'm not sure I am quoting correctly, but the answer was given that the union had agreed to it, that they could live with it. Tr. 314.

The December plan, which is the subject of this lawsuit, differs substantially both as to scope and procedures, from the March plan. Those changes include:

1. The priority groups were established by job classification rather than by pay grade.

2. Pay Grades I–VIII were eliminated from the plan, leaving only pay grades XI through XIII affected by priority posting (Prioritization would occur in the lower grades only when outside hiring was needed to fill the vacancy).

3. Job classifications were dropped from the plan permanently once SMSA guidelines were reached.

4. Job classifications with fewer than six incumbents were not covered by priority posting.

5. Priorities were limited to two race/sex groups.

6. Priorities were set on a strict "every other posting" basis regardless of whether the priority was satisfied.

7. Constructive seniority was provided for those individuals bypassed for promotion because of the operation of the priority posting system. (If an individual later becomes the successful bidder on a job for which he or she was earlier bypassed, that individual would be given classification seniority from the date he or she was bypassed).

8. The plan duration was shortened from five to three years and expires on December 12, 1987.

Despite the significant changes encompassed in the December plan, it, like its predecessor, was not without problems. In late May or early June two female employees with very little company seniority were awarded promotions ahead of more senior employees due to the priority posting plan. MLG & W responded by modifying the December plan to provide that employees must have between four and five years company seniority to be eligible for priority. The Union had suggested a 1976 seniority cut-off date but MLG & W determined to reject that suggestion because it would restrict the number of available qualified candidates and thereby make it more difficult to meet the SMSA guidelines.

The Union continued to object to the problems in implementation and MLG & W's failure to provide it with compliance reports as required by the plan. Shortly before the Board of Commissioners approved the seniority requirement modification on the plan, the Union filed the present action.

*Plaintiff's Contention*

Plaintiffs contend the priority posting provisions of the affirmative action plan are violative of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Fourteenth Amendment made actionable under 42 U.S.C. § 1983. It is argued the plan, as modified, was not adopted to eliminate the effects of past discrimination but rather is directed solely at attaining an artificial racial and sexual balance in the MLG & W workforce. Therefore, it is asserted the plan is not reasonably or substantially related to the objective of remedying the effects of past discrimination.

Plaintiffs further contend the plan violates the bona fide seniority provision of the Memorandum of Understanding between the Union and MLG & W, a provision which MLG & W should be estopped to deny. Plaintiffs allege the plan is really "no plan at all" because of the numerous errors made in its implementation, MLG & W's failure to comply with its provisions and the difficulty in monitoring it.

Plaintiffs allege MLG & W should not have utilized the SMSA statistics for comparison when setting the goals for promotion and bidding in the internal work force; rather, the appropriate labor pool for purposes of comparing the percentage of minorities in the work force is the composite of the total internal work force. In conjunction with that argument, it is also claimed MLG & W is not hiring in compliance with SMSA guidelines and is, therefore, creating an under-representation of females in the workforce. That statistical imbalance, according to the plaintiffs, is being used by MLG & W as justification for priority posting in promotions.

*Defendants Contentions*

Defendant contends the current affirmative action plan, including the priority posting provisions, is valid under both Title VII and the Fourteenth Amendment. It is argued the plan serves an important governmental interest, i.e., remedying substantial and chronic underrepresentation of minorities and females which exists due to past discrimination in hiring and promotion at MLG & W. The plan is designed to benefit the general class of persons likely to have been victims of that discrimination.

Defendant asserts the plan's remedial measures are reasonable under constitutional standards. It is argued the plan is substantially related to the objectives of remedying past discrimination and correcting substantial and chronic underrepresentation of minorities and females. It is further contended whites and males are not unduly stigmatized by the plan. The plan contains no layoff provisions, is narrow in scope and application, is relatively short in duration, and requires all prioritized bidders to meet the same minimum qualifications required for nonprioritized bidders. In summary, defendant submits the present plan's effect of infringing on seniority and on employee expectations is more moderate than any of the affirmative action plans approved by the Supreme Court and by the Sixth Circuit.

Defendant also contends Title VII and the Fourteenth Amendment do not require that voluntary affirmative action plans be collectively bargained nor was collective bargaining required by any other federal or state law. It is nevertheless asserted the Union mutually worked out the plan with MLG & W, consented and agreed to the plan, and acquiesced to the plan.

Defendant's final contention is that the present affirmative action plan does not violate any of the orders in the *Armmer* cases, particularly the 1980 Consent Decree. It is argued "targeting," which was found to violate the 1980 Consent Degree and the Memorandum of Understanding incorporated therein, and the present priority posting provision are very different. It is also asserted "targeting" was enjoined in *Armmer,* not because it was illegal under Title VII or the Fourteenth Amendment and not because it violated the seniority system utilized at MLG & W, but rather because it violated the specific provisions in the 1980 Consent Decree. Defendant further asserts the 1980 Consent Decree was terminated by the Court on February 29, 1984, prior to the adoption of the present affirmative action plan.

Analysis—Standard Applicable To Voluntary Affirmative Action Plans Adopted By Public Employers

The plaintiff brought this action claiming the priority posting provisions of the MLG & W affirmative action plan violate both Title VII and the Equal Protection Clause of the Fourteenth Amendment. While this Circuit continues to recognize the distinction between the analysis employed in reviewing Title VII cases and that employed under the Fourteenth Amendment, it has been recognized that the constitutional analysis may be more exacting, and, as a consequence, an affirmative action plan valid under the Fourteenth Amendment "will certainly pass muster under Title VII." *Bratton v. City of Detroit,* 704 F.2d 878, 887 (6th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). Therefore, the Court will review the present plan to determine whether it is valid under the Equal Protection Clause of the Fourteenth Amendment.

The precise standard of review for cases such as the present one involving voluntary affirmative action plans adopted by governmental employers has been difficult to discern. *See Bratton,* 704 F.2d at 885. Very recently, in *Wygant v. Jackson Board of Education,* —— U.S. ——, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), the Supreme Court agreed on the Equal Protection Clause standard applicable to racial classifications that work to the disadvantage of non-minorities. As Justice O'Connor noted in her separate opinion, apparently all the members of the Supreme Court agree "racial classifications of any sort must be subjected to 'strict scrutiny,' however defined."

*Id.* 106 S.Ct. at 1852 (opinion of O'Connor, J., concurring). The problem develops in ascertaining how "strict scrutiny" is defined. Chief Justice Burger, Justice Rehnquist and Justice O'Connor share the view expressed by Justice Powell that "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination" and that "the level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination." *Id.* 106 S.Ct. at 1846. The exacting examination involves a two prong test. "First, any racial classification 'must be justified by a compelling governmental interest.' Second, the means chosen by the State to effectuate its purpose must be 'narrowly tailored to the achievement of that goal.' " *Id.* (citations omitted).

Justices Brennan, White, Marshall and Blackmun, while agreeing "strict scrutiny" is appropriate, apparently maintain their definition of that standard as they expressed it in *Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). "[O]ur review under the Fourteenth Amendment should be strict—not ' "strict" in theory and fatal in fact' because it is stigma that causes fatality—but strict and searching nonetheless." *Id.* 438 U.S. at 361–62, 98 S.Ct. at 2784–85 (opinion of Brennan, White, Marshall, and Blackmun, JJ.) (footnote omitted). The Justices explained:

> [A] number of considerations—developed in gender-discrimination cases but which carry even more force when applied to racial classifications—lead us to conclude that racial classifications designed to further remedial purposes " 'must serve important governmental objectives and must be substantially related to achievement of those objectives.' "

*Id.* at 359, 98 S.Ct. at 2783 (citations omitted).

While the lack of unanimity obviously creates some difficulty for this Court in applying the "strict scrutiny" standard,

Justice O'Connor's discussion in her concurring opinion in *Wygant* is helpful.

Although Justice Powell's formulation may be viewed as more stringent than that suggested by Justices Brennan, White, Marshall, and Blackmun, the disparities between the two tests do not preclude a fair measure of consensus. In particular, as regards certain state interests commonly relied upon in formulating affirmative action programs, the distinction between a "compelling" and an "important" governmental purpose may be a negligible one. The Court is in agreement that, whatever the formulation employed, remedying past or present racial discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program. This remedial purpose need not be accompanied by contemporaneous findings of actual discrimination to be accepted as legitimate as long as the public actor has a firm basis for believing that remedial action is required. Additionally, although its precise contours are uncertain, a state interest in the promotion of racial diversity has been found sufficiently "compelling," ... to support the use of racial considerations in furthering that interest. And certainly nothing the Court has said today necessarily forecloses the possibility that the Court will find other governmental interests which have been relied upon in the lower courts but which have not been passed on here to be sufficiently "important" or "compelling" to sustain the use of affirmative action policies.

It appears, then, that the true source of disagreement on the Court lies not so much in defining the state interests which may support affirmative action efforts as in defining the degree to which the means employed must "fit" the ends pursued to meet constitutional standards. Yet even here the Court has forged a degree of unanimity; it is agreed that a plan need not be limited to the remedying of specific instances of identified discrimination for it to be deemed sufficiently

"narrowly tailored," or "substantially related," to the correction of prior discrimination by the state actor.

In the final analysis, the diverse formulations and the number of separate writings put forth by various members of the Court in these difficult cases do not necessarily reflect an intractable fragmentation in opinion with respect to certain core principles. Ultimately, the Court is at least in accord in believing that a public employer, consistent with the Constitution, may undertake an affirmative action program which is designed to further a legitimate remedial purpose and which implements that purpose by means that do not impose disproportionate harm on the interests, or unnecessarily trammel the rights, of innocent individuals directly and adversely affected by a plan's racial preference. *Wygant*, 106 S.Ct. at 1853 (O'Connor, J., concurring).

*Application Of Analysis To The Present Affirmative Action Plan*

A. *Governmental Interests*

MLG & W submits there exists a substantial and chronic underrepresentation of females and blacks at MLG & W particularly in the upper salary grades that have been traditionally male-white jobs. It is asserted this underrepresentation existed in the past and at the time of the adoption of the affirmative action plan. In Salary Grades IX through XIII, the positions to which priority posting is applied, the record does indeed reveal that the percentage of females and blacks employed was substantially lower than the SMSA figures. Of the sixteen job titles covered by the priority posting provisions, the percentage of white males exceeded SMSA percentages in each; black males were underrepresented in six; black females were underrepresented in fifteen; and, white females were underrepresented in all of the job titles. *See* Defendant's Exhibit 50. In addition to this numerical disparity, the documents generated by the *Armmer* cases, which were made a part of the present record, indicate a past

policy of across-the-board discrimination at MLG & W against blacks and females. Segregated lockers, restrooms, and eating facilities, lack of opportunities for training and promotion of black and female employees, discriminatory job classifications and stereotyping of jobs as white, male, black and female, were practices that existed in the past at MLG & W. Additionally both the Union and MLG & W stipulated, in the *Armmer* cases, Shelby County had a history of race and sex discrimination in the past.

Given these circumstances and undisputed historical facts, the Court has no difficulty in finding MLG & W had a "firm basis for believing that remedial action [was] required" to attempt to eliminate the effects of past discrimination which had resulted in the "chronic and substantial" underrepresentation of black and female employees in the upper salary grades. As stated by the Court in *Wygant*, "a public employer ... must ensure that, before it embarks on an affirmative action program, it has convincing evidence that remedial action is warranted." 106 S.Ct. at 1848. While the ultimate burden remains with the opposing party to demonstrate the unconstitutionality of an affirmative action plan, "the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary." *Id.*

The preponderance of the evidence in the record before this Court supports the conclusion that discrimination against black and female employees existed in the past and the effects remained at the time MLG & W implemented its affirmative action plan. In terminating the 1980 Consent Decree, the Court noted MLG & W had made "substantial progress" toward achieving the goals of the consent decree. One of the long term goals of the 1980 Consent Decree was "to hire and promote blacks and females so that the number of blacks and female employees in each job classification at MLG & W corresponds with their respective proportions in the labor force in Shelby County." That goal obviously had

not been met at the time the 1980 Consent Decree was terminated. In response to questions at trial as to why MLG & W adopted an affirmative action plan, in particular, the priority posting provisions, following termination of the Consent Decree, Larry Papasan, President of MLG & W testified:

It had always basically been an assumption on our part, a feeling on our part, we planned for affirmative action following the consent decree. The first discussions, specific discussions that I recall having began in the late fall of 1983, which preceded the March 15th plan. It was our feeling there had been, which resulted in the consent decree, some major problems at the division, discrimination that had taken place in the past. There had been a substantial under-utilization of both blacks and females in a number of our classifications.

The consent decree, that we were planning at that time and hopefully would be terminated and eventually was the end of February, would put us in a position of substantially compiling [sic], but there was no way that we were going to be in compliance with the SMSA guidelines and we could see that at that time.

Tr. 343–44.

Mr. Papasan further stated:

Our reports that we had that were being given to us on a regular basis indicated that we still had substantial under-representation, under-utilization in a number of categories. that was particularly true in our higher classifications.

.     .     .     .     .

... I think everyone was aware of the major problems that existed prior to the consent decree in '76. It was, you know, major in the nature to the point, you know, you had separate facilities. There were very few blacks and women that were allowed any upward mobility. There were jobs that were considered, black at that time, white male jobs, black/white jobs, that was common place

prior to, really I am going back now to the 1960's.

Tr. 345.

When asked about the statistical under-utilization of both blacks and females present at the time the affirmative action plan was implemented, Mr. Papasan testified:

Well, it was obvious that our goal of the SMSA had not been completed, and we had made a commitment, I felt, to strive toward meeting those goals. And there were some areas that I felt that we made no sufficient progress in, so my interpretation of the data was that we still had work to be done and we needed the affirmative action plan in order to assist us to get it done within a reasonable time frame.

.     .     .     .     .

I thought that we had the effects of some past discrimination. I thought that it was still showing up in the classifications.

Tr. 353.

To summarize, the Court finds, as a matter of fact, MLG & W had convincing evidence before it to warrant undertaking a voluntary affirmative action plan to remedy the effects of past discrimination. Thus, the first prong of test is met: "remedying past or present racial discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action plan." *Wygant*, 106 S.Ct. at 1853. (O'Connor, J., concurring).

B. *The Means Chosen to Effectuate the State Purpose*

Having determined MLG & W had a sufficient state interest in taking remedial action, the Court must now determine whether the means chosen, i.e., the priority posting provisions of the affirmative action plan, are sufficiently "narrowly tailored" or "substantially related" to remedying the effects of prior discrimination. Again, using Justice O'Connor's discussion for guidance, the Court must consider whether the

priority posting provisions impose "disproportionate harm on the interests, or unnecessarily trammel the rights, of innocent individuals directly and adversely affected by a plan's racial [and sexual] preference." *Id.* at 1853–54. Additional guidance in defining "narrowly tailored" is set forth in footnote six of the Court's opinion in *Wygant:*

The term "narrowly tailored, so frequently used in our cases, has acquired a secondary meaning. More specifically, as commentators have indicated, the term may be used to require consideration whether lawful alternative and less restrictive means could have been used. Or ... the classification at issue must "fit" with greater precision than any alternative means." "[Courts] should give particularly intense scrutiny to whether a nonracial approach or a more narrowly tailored racial classification could promote the substantial interest about as well and at tolerable administrative expense."

*Id.* at 1850, n. 6 (citations omitted).

■ Initially, it should again be restated, the burden of demonstrating, by a preponderance of the evidence, that the priority posting plan is not "narrowly tailored" or "substantially related" to the remedial purpose remains on the plaintiff. While making the determination of whether that burden has been met remains a challenge, the decision is *Wygant,* as well as cases in this Circuit, provide invaluable assistance. Upon a careful review of the present plan and the application of the standards set forth in those opinions, the Court concludes the priority posting provisions of the MLG & W affirmative action plan are "narrowly tailored" and "substantially related" to achieving a legitimate remedial purpose.

As stated by Justice O'Connor, the Supreme Court agrees a subject plan "need not be limited to the remedying of specific instances of identified discrimination for it to be deemed sufficiently 'narrowly tailored' or 'substantially related,' to the correction of prior discrimination by the state actor." *Wygant,* 106 S.Ct. at 1853 (O'Con-

nor, J., concurring). It was also noted the Court agreed the means adopted for such a "correction" must "not impose disproportionate harm on the interests, or unnecessarily trammel the rights, of innocent individuals directly and adversely affected by a plan's racial preference." *Id.* at 1853–54. In determining whether the rights of white males at MLG & W are "unnecessarily trammeled" by the priority posting plan, the Court looks for guidance from the Court of Appeals for the Sixth Circuit.

In *Bratton,* cited earlier in this opinion, that court specifically addressed the question of whether a race preference in promotions contained in the city of Detroit's affirmative action plan "unnecessarily trammeled the rights of white employees." While the Court applied the so called "reasonableness test" which was specifically rejected in *Wygant,* the discussion of the criteria used is extremely helpful. The "plan" in *Bratton* was explained as follows:

In 1974, the Detroit Police Department voluntarily adopted a set of affirmative action plans in an effort to eliminate discriminatory hiring practices and to increase the number of minority applicants being promoted from existing promotion lists. The three basic job levels in the department are patrolman, sergeant and lieutenant. An end goal of a 50/50 staffing ratio was adopted for all levels. The portion of the plan pertinent to the instant appeal is that affecting the guidelines for promotions from sergeant to lieutenant.

. . . . .

The affirmative action plan does not alter the basic criteria for determining promotion eligibility, nor does it alter the minimum requirements necessary for consideration for the rank of lieutenant. The plan mandates that two separate lists for promotion be compiled, one for black and the other for white officers. The rankings on those lists are then made in accordance with the same numerical rating system previously employed. The promotions are made alter-

natively from each list so that white and black officers are promoted in equal numbers. This 50/50 plan is to remain in effect until fifty percent of the lieutenant corps is black, an event estimated to occur in 1990.

704 F.2d at 882 (footnotes omitted).

White officers filed suit attacking the plan as violative of Title VII and the Equal Protection Clause of the Fourteenth Amendment. After noting a plan valid under the Fourteenth Amendment, with its more exacting standard, would "certainly pass muster under Title VII," *id.* at 887, the court applied the constitutional standard as set forth in Judge Lively's opinion in *Detroit Police Officers Association v. Young,* 608 F.2d 671 (6th Cir.1979). In *Young,* the Court noted in cases involving discrimination against those not traditionally discriminated against, a slightly different type of "strict scrutiny" is applied. 608 F.2d at 697. Under this standard a two-step analysis is required. The government must have a significant interest in implementing the remedial measures and the means adopted must be reasonable. *Bratton,* 704 F.2d at 887. Reasonableness is determined by "an examination of whether any discrete group or individual is stigmatized by the program and whether racial classifications have been reasonably used in light of the program's objectives." *Id.* (citing *Bakke,* 438 U.S. at 372–76, 98 S.Ct. at 2790–92). After finding the city had "a sound basis for concluding that minority under-representation [was] substantial and chronic, and that the handicap of past discrimination [was] impeding access and promotion of minorities," and, as a consequence, had a sufficient interest in remedial action, the *Bratton* Court addressed the "reasonableness" of the city's plan.

First the court examined the plan to determine whether a constitutionally impermissible stigma attached to those disadvantaged by the plan. 704 F.2d at 890–91. Initially, it was noted "[r]acial classifications which favor minorities do not *per se* result in such a stigma." *Id.* at 891. The Court then drew a distinction between cases involving claims of discrimination *against* minorities and claims by non-minorities made in the context of affirmative action plans giving minorities a preference and then stated, "we are dealing with a white majority which has traditionally benefited from prior systematic discriminatory practices which have given rise to the need for the kind of affirmative action program the Detroit Police Board implemented." *Id.* It was determined the white officers suffered no stigma for two reasons:

> The purpose of this program is to aid blacks, it is not aimed at excluding whites—the fact that whites have equal access to the lieutenant ranks and that the plan is only temporary clearly supports this conclusion.
>
> Second, we believe that where those hired or promoted by operation of affirmative action are qualified for the position in which they are placed, no constitutionally impermissible stigma attaches.

*Id.*

The court then turned to the question of whether the means, the 50/50 promotion preference, passed the reasonableness test. While stating no one characteristic is determinative, the Court listed the following factors which it considered in finding the plan was "reasonable":

> (1) the affirmative action plan is "substantially related" to the objective of remediation of prior discrimination, (2) the use of racial classifications reflects the only legitimate method for achieving those objectives in light of the urgent need for a remedy and the practical limitations placed on the effective use of other means, (3) the plan is temporary in nature, scheduled to endure only so long as is necessary to achieve its legitimate goals, and (4) the plan does not otherwise "unnecessarily trammel" the interests of white candidates for promotion.

*Id.* at 892 (citations omitted).

The plaintiffs in *Bratton* contended the plan was constitutionally infirm because it "unnecessarily trammeled" the interests of white officers. The court specifically addressed the contention and concluded:

Where, as here, the plan does not mandate the promotion of unqualified candidates, a significant number of white employees have been promoted under the plan, the operation of the plan does not otherwise hinder the rights of these employees and the plan is merely of a temporary nature, we find that the interests of the white officers have not been "unnecessarily trammeled."

*Id.* at 897.

While this Court recognizes the observation made in *Wygant* that the so called "reasonableness test" is not the appropriate standard and that some form of "strict scrutiny" is required, the distinction may be more one of semantics than substance. Many of the "factors" considered under the reasonableness test are the same factors which must be considered in determining whether the subject plan is "substantially related" or "narrowly tailored." Fortunately, the Court need not attempt to answer a question the Supreme Court has been unable to answer—namely, the precise standard applicable to affirmative action plans containing minority preferences. This is so because the Court finds the priority posting plan to be constitutionally permissible regardless of which standard is applied. The Court finds the priority posting plan is "narrowly tailored" toward achieving the goal of remedying effects of past discrimination against black and women employees at MLG & W; given the plan meets this test, the most exacting standard applicable, the plan obviously "passes muster" under the possible alternatives.

Specifically, the Court finds:
1. The priority posting plan is the least restrictive of the lawful alternative means and that it "fits" with greater precision than those alternatives;
2. the use of the race/sex preference in promotions reflects the only legitimate method for achieving the objective of remedying the substantial and chronic underrepresentation of black and female employees in the upper level bargaining unit salary grades;

3. the plan is temporary in nature—as salary grades reach the SMSA objectives they are permanently dropped from prioritizing and, in any event, the plan itself terminates on December 12, 1987; and
4. the plan, particularly as modified, does not "unnecessarily trammel" the interests of white males.

With regard to the question of whether the interests of white males are "unnecessarily trammeled" by priority posting, the Court would point out white males are the only sex/race group that does not receive priority in promotions under the plan. While two of the named plaintiffs in this action are black males, the Court would be required to take an extremely myopic view of the MLG & W affirmative action plan to find black males, as a class, are not beneficiaries of a preference under priority posting. Women may, in fact, receive a greater preference but this does not affect either the Court's analysis or conclusions concerning the constitutionality of MLG & W's affirmative action plan. Thus, white males are the non-preferred class and it is their interest which must be examined.

Larry Papasan testified prior to the termination of the 1980 Consent Decree, white males were still receiving between sixty-five and seventy percent of all bid jobs at MLG & W. (Tr. 357). That testimony was not disputed. It is also important to note the present plan does not call for the layoff or displacement of white male employees; rather, it merely provides for a preference in promotions for black males and women in certain classifications where there is underrepresentation. The plan itself incorporates several measures to lessen the adverse impact on white males. Priority posting is applied on a strict every-other-posting basis; thus, on half the openings white males are not at any disadvantage. Constructive seniority is also provided for any employee who is by-passed because of priority posting. Finally, the plan does not absolutely bar white males from obtaining a promotion even on a job that is "prioritized." If no member of the preferred group is the successful qualified bid-

der on a prioritized opening, the senior qualified bidder, including a white male, is selected.

In summary, the Court finds the MLG & W affirmative action plan, including the priority posting provisions, is "narrowly tailored" and does not "unnecessarily trammel" the rights of white male employees. The means adopted by MLG & W to remedy the effects of past discrimination against black and female employees appear to the Court to "fit," with sufficient precision, the stated goals. Of all the available alternatives, MLG & W has chosen the least restrictive means to achieve its objectives and one that has a minimal adverse affect on the non-preferred group.

*Conclusion*

It is the conclusion of this Court the present MLG & W affirmative action plan and the priority posting provisions contained therein do not violate the Equal Protection Clause of the Fourteenth Amendment. The present plan satisfies the strict scrutiny test required under the Fourteenth Amendment and, as a consequence, "passes muster" under Title VII. MLG & W had a firm basis for believing the substantial and chronic underrepresentation of black and female employees in the upper salary grades was due, in part, to the lingering effects of past discrimination. The governmental interest in remedying such a problem is sufficiently "compelling" to warrant the implementation of a narrowly tailored affirmative action plan designed to benefit black and women employees. The present plan, as modified, meets the "narrowly tailored" definition. It is very narrow in application and scope and is extremely short in duration; its effect on white males is sufficiently limited to insure that group's interests are not "unnecessarily trammeled" and that no stigma attaches. The seniority requirement modification, the award of constructive seniority to by-passed employees and the strict "every-other-posting" procedure greatly diminish any adverse impact on the non-preferred group including white-males. In short, the MLG & W affirmative action plan does not violate federal constitutional or statutory law.

Plaintiffs' observation that there has been no case to date where a court has approved an affirmative action plan over the objections of the union that it violated a bona fide seniority system does not change this Court's conclusion. The Court need not address the issues of whether the present seniority system is bona fide or whether the Memorandum of Understanding in which it is contained is enforceable under state law. Those issues, as well as others raised by both parties, have little relevancy to the present case. The only real issue before the Court is whether the voluntary affirmative action plan adopted by MLG & W, a governmental entity, was legally permissible under federal constitutional and statutory law. After applying the appropriate standard of review—strict scrutiny—the Court concludes the MLG & W affirmative action plan does not violate the Equal Protection Clause of the Fourteenth Amendment or Title VII.

Therefore, for the reasons stated herein, the Court hereby denies plaintiffs' request for injunctive and other relief and hereby declares the present MLG & W affirmative action plan is constitutional and valid under Title VII.